**In re Kiku KIRILUK, Debtor.**

**Kiku KIRILUK, Plaintiff,**

v.

**The CHESTER WATER AUTHORITY and Delcora, Defendants.**

**Bankruptcy No. 86–04030F.**
**Adv. No. 86–1021F.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Sept. 4, 1987.

Jeffrey M. Edelson, Delaware County Legal Assistance Ass'n, Chester, Pa., for debtor/plaintiff, Kiku Kiriluk.

Gregg A. Parker, Blank, Rome, Comisky & McCauley, Philadelphia, Pa., for the defendant, Delcora.

Joseph Finlay, Philadelphia, Pa., Trustee.

## OPINION

BRUCE FOX, Bankruptcy Judge:

The debtor has initiated an adversary proceeding against the Delaware County Regional Water Control Authority, known as Delcora, for allegedly violating 11 U.S.C. § 362(a) and 11 U.S.C. § 366. The debtor maintains that Delcora refused to restore utility service to the debtor, postpetition, solely because of a prepetition obligation owing to Delcora. Delcora contends that it, and not the debtor, complied fully with the provisions of § 366. The debtor has moved for partial summary judgment pursuant to Bankr.Rule 7056 on the issue of Delcora's liability, reserving the issue of damages. Delcora has filed a cross motion for complete summary judgment. Since I find that material facts are in dispute, I shall deny both motions.

### I.

Bankr.Rule 7056 incorporates Fed.R. Civ.P. 56 which permits the entry of summary judgment or partial summary judgment when appropriate. As the Third Circuit Court of Appeals has noted, summary judgment "may be granted only if, as a matter of law, viewing all the evidence which has been tendered and should have been admitted in the light most favorable to the party opposing the motion, no jury could decide in that party's favor." *Tigg Corp. v. Dow Corning Corp.*, 822 F.2d 358, 361 (3d Cir.1987); *accord, Goodman v. Johnson and Co.*, 534 F.2d 566 (3d Cir. 1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977); *In re Paolino*, 75 B.R. 641, 644 (Bankr.E.D.Pa., 1987).

Certain of the facts in this case do not appear to be disputed.

Water service in the City of Chester is provided by the Chester Water Authority

(CWA) and sewer service is provided by Delcora. While each utility bills separately for its services, an arrangement apparently exists by which CWA will discontinue water service in order to aid Delcora in the collection of Delcora's delinquent accounts.

On July 22, 1986, Delcora notified the debtor that he was $766.24 delinquent in his payments and that Delcora intended to seek a termination of water service through CWA on or after August 1, 1986 unless measures were taken to bring the account current within a short period of time. On August 15, 1986, Delcora made a written request of CWA to discontinue water service to the debtor's home and CWA complied with this request on August 27, 1986. One day later, August 28, 1986, the debtor filed a voluntary petition under chapter 13 of the Bankruptcy Code.

On the same day that the debtor's bankruptcy petition was filed, the debtor through his counsel, notified Delcora and CWA of the filing. By way of affidavit in support of the motion for partial summary judgment, debtor's counsel asserts that he spoke personally with one employee of Delcora and with Delcora's counsel on August 28 and August 29, 1986, informing them of the debtor's bankruptcy filing and requesting immediate restoration of service.

When service was not restored, debtor filed the instant proceeding on September 2, 1986. At the same time, he sought an expedited hearing on a motion for a preliminary injunction against CWA and Delcora, which was granted the same day and an order was entered requiring restoration of service. Service was restored on September 2, 1986.

CWA was acting at all times at the request of Delcora. Thus, the debtor agreed to dismiss his action against CWA and to proceed solely against Delcora for permanent injunctive relief and for damages.

Certain factual matters were not agreed upon by the parties. First, in both his complaint and motion for injunctive relief, the debtor alleges that he is "ready willing and able to post adequate assurance." Delcora denies this allegation. Second, the debtor maintains that Delcora has no policy of demanding a security deposit from its customers. Delcora denies this and points to a document attached to its response to the debtor's second set of interrogatories. This document, which is unsigned, carries the heading "Resolution." The "resolution" states that it is a "draft" and was "adopted July 28, 1987"—well after the case commenced. By its terms, the "resolution" declares that Delcora will request a security deposit "equivalent to one cycle of sewer charge or such other amount as may be ordered or approved by a court of competent jurisdiction." The request is to be made of new utility users whose credit rating is "unknown" or "unsatisfactory." Debtors in bankruptcy with delinquent prepetition accounts are to be considered new users and a deposit may be requested of them if their credit rating is either unknown or unsatisfactory. The third fact not agreed upon is the debtor's assertion that his request for restoration of service was denied solely because Delcora maintained that it was not a utility service governed by section 366 of the Bankruptcy Code and therefore had no obligation to restore any service postpetition.

Because I find the record unclear regarding the conduct of the parties postpetition, as well as the policy of Delcora concerning security deposits, I will deny the various motions and set this case down for trial.

## II.

11 U.S.C. § 366 reflects a Congressional policy decision regarding the importance of utility services to debtors. By its terms, the statute states:

(a) Except as provided in subsection (b) of this section, a utility may not alter, refuse, or discontinue service to, or discriminate against, the trustee or the debtor solely on the basis of the commencement of a case under this title or that a debt owed by the debtor to such utility for service rendered before the order for relief was not paid when due.

(b) Such utility may alter, refuse, or discontinue service if neither the trustee nor the debtor, within 20 days after the date of the order for relief, furnishes

adequate assurance of payment, in the form of a deposit or other security, for service after such date. On request of a party in interest and after notice and a hearing, the court may order reasonable modification of the amount of the deposit or other security necessary to provide adequate assurance of payment.

The purpose of the section is to permit a debtor to continue to receive postpetition utility service that may be monopolistic, (*e.g.,* only one electric company services an area), and are essential to a minimum standard of living.

This section gives debtors protection from a cut-off of service by a utility because of the filing of a bankruptcy case. This section is intended to cover utilities that have some special position with respect to the debtor, such as an electric company, gas supplier, or telephone company that is a monopoly in the area so that the debtor cannot easily obtain comparable•service from another utility. The utility may not alter, refuse, or discontinue service because of the nonpayment of a bill that would be discharged in the bankruptcy case. Subsection (b) protects the utility company by requiring the trustee or the debtor to provide, within ten days, adequate assurance of payment for service provided after the date of the petition.

S.Rep. No. 95–989, 95th Cong., 2d Sess. 60 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5846;[1] *accord, In re Hobbs,* 20 B.R. 488 (Bankr.E.D.Pa.1984).

As the Third Circuit Court of Appeals has explained:

The inclusion of these provisions in the Bankruptcy Code was designed to clarify the bankruptcy court's power to prevent a utility from using its termination power to enforce payment of pre-petition debts, as long a adequate security for payment of future bills is provided to the utility.... By the terms of section 366, a utility may not terminate the debtor's service for failure to pay prepetition ar-

rearages, but may terminate the debtor's account if the debtor fails, within twenty days, to post adequate assurance of payment for post-petition services.

*In re Begley,* 760 F.2d 46, 48–49 (3d Cir. 1985) (citation omitted).

■ From a debtor's standpoint, the significance of § 366 when compared with the provisions of § 365 is striking. While a cure or assurance of a prompt cure of a prepetition default is required in order for a debtor to assume an executory contract, *see* 11 U.S.C. § 365(b)(1), a debtor need not cure a prepetition default to a utility company in order to maintain utility services. *See In re Gehrke,* 57 B.R. 97 (Bankr.D.Or. 1985). Thus, by virtue of § 362(a)(6), a utility cannot attempt to collect upon its prepetition debt, yet it must continue to provide service to the debtor, subject only to § 366(b).

■ In support of his motion for partial summary judgment, the debtor argues that § 366(b) must be applied literally. He contends that upon notice of a bankruptcy filing, a utility must restore service to a debtor whose service was terminated prepetition, for an initial period of twenty days. If the debtor does not provide adequate assurance of payment for postpetition services during that twenty day period, then the utility may again terminate services. This very argument was rejected by our district court in *In re Roberts,* 29 B.R. 808 (E.D.Pa.1983). And to the extent I have the authority to revaluate the *Roberts* holding, *compare In re Windsor Communications Corp.,* 67 B.R. 692, 698–699 (Bankr.E.D.Pa.1986) with *In re Arnold Print Works, Inc.,* 54 B.R. 562, 567 (Bankr. D.Mass.1985), *aff'd in part and rev'd in part on other grounds,* 61 B.R. 520 (D.Mass.1986), *vacated,* 815 F.2d 165 (1st Cir.1987), I believe that *Roberts* was correctly decided. However, the *Roberts* analysis is double edged when applied to this particular case.

In *Roberts,* the debtor sought restoration of the telephone service which had been

---

**1.** The Senate Report differs somewhat from the House Report. *See* 124 Cong.Rec. H 11093 (Sept. 25, 1978) (remarks of Congressman Ed-

wards). However, § 366(b) is derived from the Senate version of § 366 with the time period of § 366(b) increased to twenty days. *Id.*

terminated prepetition for nonpayment. The telephone company demanded a security deposit prior to restoration of services. The request for a security deposit was consistent with company policy concerning new customers whose credit rating was unknown or unsatisfactory. The district court rejected the same literal argument made here and required the debtor to tender the security deposit as a precondition for restoration of telephone service. The court said:

> [W]e note that the essence of the debtor's relationship with Bell is that of a new customer. As is true of all of Bell's customers who have failed to establish or maintain a satisfactory credit rating, Roberts was required to post a security deposit prior to initiation of service. To rule that Section 366(b) compels Bell to give service for twenty days without the posting of a deposit under these circumstances would be to turn the bankruptcy petition into a means of extracting greater services from Bell then it is required to give under the applicable Pennsylvania Public Utility Commission Tariffs.

*In re Roberts,* 29 B.R. at 810.[2]

The result in *Roberts* probably is consistent with Congressional intent. In drafting § 366, Congress' primary concern was the regulation of postpetition termination of utility service, not the restoration of service terminated prepetition. Thus, it is difficult to read the legislative history as expressing a Congressional determination that immediate restoration of utility service is required merely upon the commencement of the case. *Cf. In re Daily Corp.,* 72 B.R. 489 (Bankr.E.D.Pa.1987) (literal application of effective date of 1986 amendment to § 105(a) was not warranted). Moreover, the literal application of § 366(b) to restoration of service may be highly unfair to a utility which might incur significant expense to restore service only to find that the debtor cannot post the requisite adequate assurance of future payments.[3] Therefore, based upon the holding in *Roberts,* the debtor's theory of liability premised upon its contention that § 366(b) requires immediate restoration in every circumstance must be rejected.[4]

■ Delcora's request for summary judgment is based upon its contention that the debtor never offered it a security deposit or other adequate assurance of payment. Since that was not done, it had no duty to restore a water and sewer service. *See In re Marion Steel Co.,* 35 B.R. 188, 197 (N.D.Ohio 1983). My difficulty in accepting this argument on a motion for summary judgment is both factual and legal. Factually, it is unclear that the debtor failed to make an offer to Delcora, for the pleadings are ambiguous. Legally, it is unclear whether the debtor had any obligation to do so.

While Delcora relies upon *Roberts* it fails to grasp the import of *Roberts'* reasoning.

---

**2.** To the extent necessary, one can reconcile the holding in *Roberts* with that of *Henry v. Heyison,* 4 B.R. 437 (E.D.Pa.1980). The latter held that the anti-discrimination provision of 11 U.S.C. § 525 means that a governmental unit "[o]nce a debt has been discharged.... may not treat a debtor differently than a person who never incurred a debt." *Id.* at 442. Consistent with both *Roberts* and *Henry,* a utility company may view the credit history of a bankruptcy debtor seeking restoration of service as unknown (as if the debt never existed) rather than unsatisfactory.

**3.** I note that even in the termination context, § 366(b) has not always been applied literally. A utility might argue that once the twenty days has expired without a debtor's posting adequate assurance it may terminate service and it ceases to have any obligation to restore services, even if such assurance is forthcoming at a later date.

Without discussion some courts have not viewed § 366(b) so restrictively. *See In re Allen,* 69 B.R. 867, 874–875 (Bankr.E.D.Pa.1987); *Lloyd v. Champaign Telephone Co.,* 52 B.R. 653 (Bankr.S.D.Ohio, 1985) (court ordered reconnection when security deposit was paid; *In re Broadnax,* 37 B.R. 909 (Bankr.E.D.Pa.1984) (debtor did not seek restoration until six months after petition was filed); *In re Dandi-Line Plants, Inc.,* 27 B.R. 868 (Bankr.N.D.Ala. 1983) (debtor made no offer until three months after petition was filed). *But see In re Kentech Corp.,* 36 B.R. 552 (Bankr.W.D.Ky.1983) (where the debtor failed to "assume" cable service, that service cannot be restored).

**4.** Debtor's reliance upon *In re Penn Jersey Corp.,* 72 B.R. 981 (Bankr.E.D.Pa.1987) and *In re Allen* are misplaced. Neither case involved restoration of previously terminated utility services.

*Roberts* likened a debtor, postpetition, to a new customer, and concluded that a utility can treat all new customers alike. In this circuit, this reasoning, (bolstered by the antidiscrimination language of § 366(a)), has caused courts to hold that a utility cannot demand more of its debtor "new customer" than it demands of other new customers.

For example, in *In re Coury,* 22 B.R. 766 (Bankr.W.D.Pa.1982), the bankruptcy court held that the utility could not demand security deposits from debtors who were not in default on their payments prepetition. It stated:

> This court finds that it would be unreasonable for the utility to demand more of a non-defaulting debtor than it would of a new customer. If the utility were to demand more of the debtor, the utility would be attempting to gain an advantage from the fact of a bankruptcy filing. This is contrary to the intent of the bankruptcy laws.

*Id.* at 768; *accord, In re Begley,* 41 B.R. 402, 406 (E.D.Pa.1984), *aff'd,* 760 F.2d 46 (3d Cir.1985) ("as a matter of policy, to grant the utility the right to terminate utility services without complying with the applicable state procedures is to grant the utility leverage over a bankrupt debtor which it would not have absent the petition in bankruptcy"); *In re Kelly,* 25 B.R. 249 (Bankr.E.D.Pa.1982); *In re Shirey,* 25 B.R. 247 (Bankr.E.D.Pa.1982); *In re Demp,* 22 B.R. 331 (Bankr.E.D.Pa.1982). Some courts in other jurisdictions have reached a similar conclusion. *See In re Keydata Corp.,* 12 B.R. 156, 158 n. 2 (Bankr.App.D. Mass.1981) ("It does not appear in the Code or the legislative history that Congress ever intended that utilities receive higher protection in chapter 11 than they enjoy in their regular dealings with customers outside the bankruptcy court"); *Lloyd v. Champaign Telephone Co.,* 52 B.R. at 656.

Once one concludes - that Congress intended debtors to be treated by utilities as if they were new customers, no better and no worse, then those decisions permitting utility companies to "discriminate" and demand security deposits from debtors even though the utility demands deposits of no one else must be incorrect, insofar as they rely upon the first sentence of § 366(b). *See In re Marion Steel Co.* (utility can demand deposit even if its own regulations do not support such a demand); *In re Smith, Richardson & Conroy, Inc.,* 50 B.R. 5 (Bankr.S.D.Fla.1985) (utility can demand deposit from debtors who had no prepetition delinquency); *In re Santa Clara Circuits West, Inc.,* 27 B.R. 680 (Bankr.D.Utah 1982); *In re Northwest Recreational Activities, Inc.,* 8 B.R. 7 (Bankr.N.D.Ga.1986) (§ 366(b) allows utility to demand deposit although its regulations contain no deposit provision). To the extent that a bankruptcy court is not bound to follow state utility regulations regarding utility deposit for new customers, *see In re Utica Floor Maintenance, Inc.,* 25 B.R. 1010, 1017 (N.D.N.Y.1982); *Lloyd v. Champaign Telephone Co.; Hennen v. Dayton Power & Light Co.,* 17 B.R. 720 (Bankr.S.D.Ohio 1982), that discretion flows from the express Congressional authority granted in the second sentence of § 366(b). And such discretion is triggered only upon the request of a party in interest and after notice and hearing.

In the case at bench, Delcora had the duty to treat Mr. Kiriluk as if he were a new customer. If it had no policy of demanding security deposits from any new customers, then it had a duty to restore service upon notice of the debtor's filing unless it sought court approval to do otherwise. Thus, depending upon Delcora's policy concerning new customers, Delcora's argument, that it had no obligation to take any action upon receiving notification of the debtor's bankruptcy filing, may not be correct.[5] Certainly, the record is unclear

---

5. I am mindful that some courts have stated that the debtor has the burden of going forward and tendering adequate assurance. *See, e.g., Matter of Robmac, Inc.,* 8 B.R. 1 (Bankr.N.D.Ga. 1979). In this district, most of the utility companies, though possibly not Delcora, take the initiative and notify the debtor of their demand. *See also Matter of Houdashell,* 7 B.R. 901 (Bankr.W.D.Mo.1981). Moreover, where a utility company has no deposit requirement, both common sense and my reading of § 366 require

whether, at the time the debtor filed for bankruptcy and sought restoration of services, Delcora had any requirement that new customers with unknown credit histories post a security deposit.[6]

Putting aside the question surrounding Delcora's policies concerning new customers, the debtor may be able to demonstrate another reason for not tendering adequate assurance when he initially sought restoration from Delcora. The debtor maintains that Delcora informed him, through his counsel, that Delcora did not consider itself a utility within the meaning of section 366, and thus had no obligation to restore water and sewer service. Without now passing upon the issue, and recognizing that Delcora denies the debtor's version of its response, the debtor may be arguing that Delcora's position had absolutely no basis in law and that such a response from Delcora made any offer of a security deposit, or other adequate assurance, futile.

Certainly, at argument on its motion for summary judgment, Delcora conceded that it was a utility governed by section 366. Indeed, in light of the many decisions broadly defining the reach of § 366, it would be difficult for Delcora to argue otherwise. *See In re Coastal Dry Dock & Repair Corp.*, 62 B.R. 879, 883 (Bankr.E.D. N.Y.1986); *In re Kentech Corp.*, 36 B.R. 552 (Bankr.W.D.Ky.1983); *In re Good Time Charlie's, Ltd.*, 25 B.R. 226 (Bankr.E. D.Pa.1980); *In re Hobbs.* It may be, however, that Delcora's initial position was as averred by the debtor. If that be the case, it might be also that Delcora's inaction was unjustified and subject to penalty. *See In re Wagner*, 74 B.R. 898 (Bankr.E.D.Pa. 1987) (misunderstanding of the reach of the automatic stay may, nonetheless, render defendant liable for its violation).

Having noted that the issue of Delcora's liability depends upon its policies regarding new customer deposits, what offers of adequate assurance, if any, were made by the debtor when he sought restoration of utility service, and what response to that request was made by Delcora, I observe that each party disputes the factual contention of the other on these points. Therefore, as material facts are in dispute, I shall deny both parties' requests for summary judgment.

An appropriate order will be entered.

---

it, and not the debtor, to initiate a request for adequate assurance.

In this case, even if Delcora had a policy of requiring security deposits from new customers on August 28, 1986, summary judgment would not now be appropriate. As explained in the text *infra*, the debtor may be able to establish at trial that Delcora's refusal to restore service was not due to the debtor's failure to come forward with adequate assurance, but due to Delcora's belief that it was not a utility subject to § 366 and therefore had no duty at all to restore service.

**6.** Delcora's so-called "policy," as produced in response to the debtor's discovery request, is obviously patterned after *Roberts*. On its face, however, it does not appear to have been in effect in August, 1986, when this debtor sought restoration and the record is unclear whether some other policy existed as of the date the debtor filed his petition.